<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ZUMAR DANIELS, | : | |
| | : | Civil Action No. 05-1924 (JAP) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ALFARO ORTIZ, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>              Counsel for Respondents
Zumar Daniels                    Gary A. Thomas
East Jersey State Prison         Ofc. of Essex Co. Prosecutor
Rahway, NJ 07065                 Essex Co. Courts Building
                                 Newark, NJ 07102

**PISANO**, District Judge

     Petitioner Zumar Daniels, a prisoner currently confined at

East Jersey State Prison in Rahway, New Jersey, has submitted a

petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  The respondents are Alfaro Ortiz and the Attorney

General of the State of New Jersey.

     For the reasons stated herein, the Petition must be denied.

I.   <u>BACKGROUND</u>

A.   <u>Factual Background</u>

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> At 10:30 p.m. on the evening of August 7, 1996, Wanda Collins was in a fried chicken fast food restaurant in Newark.  Defendant and Durell Nickerson, both of whom Collins had known for several years, were also in the store, Nickerson was with Ramon Wilson and Taka "LaRock" Baldwin.

> According to Collins, defendant left the store after she arrived.  About fifteen minutes later, defendant returned.  He had his T-shirt pulled up so that it covered the lower part of his face.[fn1] Defendant walked over to where Nickerson was then playing a video game, said "what now, mother f-----," and shot him.  Four or five shots were fired.  Collins knew the shooter was defendant by his voice as well as his appearance.  He used a particular "high pitched" voice that she recognized when he was "mad."  Defendant "ran out" of the store immediately after shooting Nickerson, and Collins quickly left behind him.

>> [fn1] Defendant was wearing tan boots, blue denim shorts and a red T-shirt when Collins arrived at the store.  He wore the same clothes when he returned.

> After leaving the store, Collins returned to her apartment and told her mother that "we are leaving" the area.  As they were leaving, several men from the neighborhood were outside her house.  One of them, Bashir "Baba" Wilson, Ramon Wilson's brother, was loading a gun.  Collins told Wilson that it was "not

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

going to do any good to kill somebody" in revenge, and took the bullets from him.  She and her mother then started to drive south on the Turnpike towards where her grandmother lived.

During the drive, Collins and her mother were stopped by state troopers.  When asked for her license and registration, Collins' mother opened the glove compartment, revealing the bullets Collins had taken. Collins then told the officers that she had witnessed a shooting in Newark.  She was taken to a state police barracks, and gave a statement about the incident.  In this statement, she identified herself as Wanda Branch, using the name of her former husband.

Collins' initial statement was incorrect in several respects as she did not want to get involved in the matter.  She stated that there had been three men with "some kind of mask on," none of whom she could identify as the shooter.

On August 14, 1996, Collins, who was still living in Bridgeton, was interviewed again.  She told Investigator Lonnie Hinton of the Essex County Prosecutor's office and Detective Perenti of the State Police that she had not told the truth in her previous statement, and identified defendant as the shooter. She identified defendant's photograph from an array she was shown during the interview.

In the second statement Collins stated that defendant had been wearing a mask, but did not state that it was a shirt pulled up over his face.  She stated that she couldn't "remember the mask too much," but that she had seen braids sticking out of the back of the mask.  She also stated that she could see the gunman's "eyes and ... skin."  When asked why she had not told the truth in her first interview with police, Collins stated that she was "worrying about [her]self" and her family at the time.

Collins knew defendant because she had purchased cocaine from him as well as Nickerson.  She frequently had Nickerson over to her house.  However, she had stopped using drugs in 1994, after going into treatment.

3

Nikita Pickett was the other witness as to events at the chicken store.  At the time of the murder, Pickett had been living with Mary Nickerson, the victim's aunt.  Between 10:00 and 10:30 p.m. on the night in question, Pickett went to the store where the murder took place.  When she first arrived, defendant and Nickerson were both present, but defendant left shortly after she arrived.[fn2]

[fn2] When shown one of the pictures taken of defendant at the time of his interrogation, Pickett stated that the shirt shown in the picture was not the shirt he had worn on the evening in question.

After Pickett had left the store and started to walk home, she passed defendant who was going back towards the store.  Defendant had no mask on when she passed him.  A few moments later "all hell broke loose"; people were screaming, and she saw people running out of the store, one of whom was defendant.

Several days later, after seeing defendant on the street, Pickett called the police.  She gave a statement to Detective Sabur, and identified defendant as the person she had seen in the vicinity of the crime scene.  She did not mention in this statement that she had seen defendant run out of the store.

When defendant was originally located by the police, he identified himself as Raymond Wilson.  In a statement taken at police headquarters, defendant stated that he and Zumar Daniels were at the restaurant when the shooting occurred but that they "had nothing to do with the shooting."  When defendant finally acknowledged being Daniels, he admitted being at the scene "prior to the incident but left and it wasn't until he returned that he found the victim had been shot."  These statements were admitted into evidence even though defendant had declined to give a written statement in response to his Miranda warnings.  In his oral statements detailed to the jury, defendant said he "walked out [of the store] to the telephone and that is where he was when the shooting occurred."  He indicated he "left the store and ... was standing by the phone near the store when the shots were fired."  The admission of those statements is not contested before us.

Billy Jones, the owner of a garage a few doors
down the street from the crime scene, testified for the
defense.  On the evening of August 7, 1996, he had been
leaving his garage when he noticed a figure with a
white T-shirt pulled over his head coming down the
street.  The shirt covered the person's entire head.
The person went into the chicken store.  Jones heard
shots fired and saw the person run out of the store
with the shirt still covering his head.  The distance
between Jones and the chicken store was about a hundred
feet.  Jones further testified that the man he saw was
"a short person," shorter than defendant.

Cory McFarland testified that he had been inside
the store with Bashir Wilson and his brother at the
time of the shooting.  He was paying for his food with
his back to the door when he heard a shot.  At the
sound of the shots Taka Baldwin and another man started
pushing him toward the back of the store.  After the
shooting ended, McFarland rose up and looked back to
see someone run out of the store.  This person had a
white T-shirt covering his or her face.  He appeared to
be 5'9" or 5'10" tall.

(Opinion of Superior Court of New Jersey, Appellate Division,

April 13, 1999 at 3-7.)

B.    Procedural History

Petitioner was convicted by jury verdict in the Superior

Court of New Jersey, Law Division, Essex County, of murder,

N.J.S.A. 2C:11-3a, possession of a handgun without a permit,

N.J.S.A. 2C:39-5b, and possession of a firearm for an unlawful

purpose, N.J.S.A. 2C:39-4a.  He was sentenced to an aggregate

term of 30 years' imprisonment with no eligibility for parole.

On direct appeal, in an opinion filed April 13, 1999, the

Superior Court of New Jersey, Appellate Division, affirmed the

conviction.  On July 8, 1999, the Supreme Court of New Jersey denied certification.  State v. Daniels, 161 N.J. 331 (1999).

Petitioner timely filed a state court petition for post-conviction relief ("PCR") in the Superior Court of New Jersey, Law Division, Essex County.  Following a non-evidentiary hearing, the court denied the PCR petition in a letter opinion dated October 5, 2001.  The Appellate Division summarily affirmed the denial of relief in an opinion filed November 3, 2004.  The Supreme Court of New Jersey denied certification on January 20, 2005.  State v. Daniels, 182 N.J. 429 (2005).

This Petition followed.  Respondents have answered and Petitioner has filed a Reply in support of the Petition.  This matter is now ready for disposition.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

6

   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

   A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law,

the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent."  Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

III.   ANALYSIS

A.   Prosecutorial Misconduct

Petitioner contends that the prosecutor violated Petitioner's right to due process by making inflammatory remarks during his opening, by referring to a witness who never appeared but was said to be prepared to testify that the killing was a result of a drug-dealing rivalry, and during summation, when the prosecutor likened the crime to a mafia killing and made

9

references to a non-testifying co-defendant.  Petitioner also challenges the prosecutor's questioning of defense witnesses about their alleged conduct in the courtroom, in which he tried to cast doubt on the witnesses' testimony that they did not know one another.  (Petition, Grounds One, Seven, Eight.)

The Appellate Division rejected the claim of prosecutorial misconduct.

> At a pretrial hearing, the prosecutor stated that he intended to call a witness, Adam Fennell, to testify that defendant had told him that he was having a "dispute" with Nickerson over the sale of drugs in the neighborhood; Nickerson sold heroin, and "Nickerson's people" did not want Daniels selling heroin.  There was no objection.[fn3]

> > [fn3] The prosecutor also pointed out that Pickett was in the area on the night in question to buy drugs from Nickerson and "knew all the people who sold drugs," but was not going to testify about the dispute although she was "aware of it."

> The prosecutor described this dispute in his opening, and said:

> > And you're going to hear testimony that Mr. Durell Nickerson was involved in selling drugs and that Mr. Daniels was involved in selling drugs.  And some of the other individuals may have been involved in selling drugs.  You're going to hear that at least one of the witnesses, one of the female witnesses out there was in the area not only because she lived there, but she was looking to buy drugs that night.  She was looking to buy drugs from Durell Nickerson.  And this shooting, the motive for the shooting and I have to say that the State is not required to prove motive, sometime we don't really have a clear motive based upon the events that occurred, and in this case the motive appears

to have been, from the evidence, and you will
ultimately judge it, a drug dispute about
turf.  Because there is testimony I think you
will hear that Mr. Daniels and Mr. Nickerson
were both selling drugs in the area.  But
they were there, each person in terms of
selling drugs.  And Mr. Nickerson was selling
cocaine.  And he was also selling something.
You're going to hear a lot of expressions,
possibly from witnesses, called P-dope or
Dope-P.  P-dope or dope is heroin, as opposed
as to cocaine.

And there was a dispute in the period of
time prior to the murder between Mr. Daniels
and Mr. Nickerson and others that may have
been associated with Mr. Nickerson about they
wouldn't let him Mr. Nickerson and his
people, wouldn't let him, didn't want him,
Mr. Daniels, selling P-dope.  He do sell all
the cocaine he wanted, but he didn't want any
P-dope being sold there, any heroin.  And
that is why there was some friction.

You may also hear testimony that Mr.
Daniels himself believed that if he didn't do
what he did the other side may have tried to
kill him.  He may have had that belief.

You may hear some evidence that would
tend to suggest that that may have been a
motivating factor of Mr. Daniels.  In any
event, there was this dispute.  And on the
evening of August 7th at about 10:30 in the
evening, Mr. Nickerson was in a fast food
place, I think it is called United Fried
Chicken.

In his opening, the defense counsel noted that the
prosecutor alleged that "my client, Mr. Daniels, and
Mr. Nickerson were rivals," and then added "[w]hat
better person to accuse of a killing then [sic] the
rival."  Defense counsel submitted that Fennell was not
"believable" and was "totally incredible."

During the course of the trial, the prosecutor
reported to the judge that he received information from
another inmate that Fennell had made a statement to the

effect that "he would testify ... any way he would have to testify to help himself and avoid [the] possibility of a long jail term" for two Graves offenses pending against him.  The prosecutor therefore did not call Fennell as a witness.

Wanda Collins testified, however, that she had purchased drugs from defendant as well as Nickerson, whom she knew well.  Nickerson would come to her house "on the average of about one or two times a week."  She had purchased from both men "on many occasions."  She further testified that she "knew Zumar ... because I used to deal with him ..." and that she "used to purchase ... drugs off him."

Defendant moved for a mistrial because of the testimony regarding "prior bad acts."  The defendant acknowledged the judge's prior ruling regarding the relevance of the relationship on the witness' ability to identify defendant and declined a "curative instruction" at that point.  Subsequently, after Ms. Collins testified to her reason for giving her initial statement to the police, ... defendant moved for a mistrial based on the inference of "other acts that could be construed to be criminal" or at least a "caution[ary]" instruction.  The judge thereafter charged the jury as noted as noted ... .  As part of that charge, the judge said:

> You also heard some, again, comments regarding the fact that maybe Mr. Daniels was involved in either the sale of drugs down in that Strafford Avenue neighborhood in the City of Newark.  Same premise applies, folks. The facts that maybe Mr. Daniels, if you believe that testimony, was involved in illegal sale of narcotics, which is a violation of New Jersey Statutes is not any indication that he is predisposed to commit a crime or he committed the crimes with which he is charged in this case.  That is being allowed in the case solely based on the State's alleged motive theory that the reason that the shooting took place was because there was a dispute over a drug territory and the State's allegations are that Mr. Daniels utilized the form of violence to eliminate a competitor.

12

So it is given only or solely for that specific purpose, folks. We are going to ask you not use it during the course of this trial for any other purpose. At the end of the trial we'll give you [a] much more detailed charge. I just want you to be aware of that fact[] right up front. When you hear it, just because it is being stated doesn't make it so. Then just weigh the testimony at the end, it is going to be one of your decisions on credibility for all the witnesses, including Ms. Collins.

Defendant voiced no objection to this aspect of the charge.[fn4]

[fn4] As noted, supra, defendant objected to the suggestion that "there [were] other [bad] acts," and the judge invited defendant to submit language for a curative instruction on that subject.

Defendant admits in his brief before us, as he did at trial, that this evidence was "arguably admissible as being relevant to the ability of Wanda Collins to identify the defendant as the perpetrator." However, he argues that a mistrial should have been granted based on the prosecutor's opening statement because Fennell did not testify and no evidence of motive was ever produced.[fn5]

[fn5] At the close of the case defendant moved for a mistrial "based on the prosecutor's opening statement" because Fennell was not called. The judge ruled that defendant could argue in his summation that the promised testimony concerning motive never materialized. He also concluded that the issue of "motive" was in the case because of the testimony of "Ms. Pickett and more importantly, Ms. Collins."

We agree with defendant that prosecutors may not go beyond the facts before the jury in making statements. State v. Roach, 146 N.J. 208, 219, cert. denied, __ U.S. __, 117 S.Ct. 540, 136 L.Ed.2d 424 (1996). Nevertheless, we cannot conclude from the record before us that the prosecutor did not have a

13

good faith belief that he would produce Fennell as a witness to present testimony relating to a drug dispute between defendant and the victim and the resulting motive for the shooting.[fn6]  Further, an inference of such motive was produced.  As a result, we cannot conclude that the trial judge abused his discretion in denying a mistrial, and "an appellate court [can]not disturb a trial court's ruling on a motion for mistrial absent an abuse of discretion that results in a manifest injustice." State v. Harvey, 151 N.J. 117, 205 (1997). See also, e.g., State v. DiRienzo, 53 N.J. 360, 383 (1969).

> [fn6] Defendant told the trial judge that the witness to whom Fennell said he would say anything "to help himself" was known to the prosecutor before the openings.  He did not further develop the point.

Moreover, the judge instructed the jury in his final charge that what the attorneys said was not evidence in the case.  He specifically said that "[i]f you didn't hear it testified under oath by a witness on the stand in this case, then it didn't happen."  We recognize that the judge also advised the jury in his final instructions that Ms. Collins' testimony concerning her knowledge of defendant's drug sales "was admitted into evidence ... for a very limited and specific purpose" relating to "identification" and could be used "only in weighing the identification of Mr. Daniels by Ms. Collins."  However, consistent with his ruling at the end of the case that Collins' testimony was relevant to the question of "motive," the judge also instructed:

> Mr. Daniels's position is I am not the person who shot Mr. Nickerson and you know what the State's position is in this case. Although, the State has proof that the defendant acted either purposely or knowingly the State is not required to prove a motive.

> If the State has proved the essential elements of the offense beyond a reasonable doubt Mr. Daniels must be found guilty of the offense regardless of motive or a lack of a motive.  If the State, however, has proved a motive you may consider that motive in as far

14

as it gives meaning to the other
circumstances in the case.  On the other
hand, you may consider the absence of a
motive in weighing whether Mr. Daniels is
guilty of the crimes charged in this case.

There was no objection to the charge, and the
instructions concerning the absence of proof of motive,
particularly after Fennell did not testify, were to
defendant's benefit.  We find no basis on which to
reverse.

        ...

        Similarly, the judge's forceful instructions, when
objections were voiced during the prosecutor's
summation, cured the objectionable comments.  While we
find inappropriate the prosecutor's references to the
shooting as "akin to what happens in organized crime"
and the "mafia" with respect to letting it be known who
shot a member of "the other team," the prosecutor was
merely suggesting defendant was sending a clear message
to his rivals, a warning that supported the theory of
motive.  The shooting in public view by someone who
hardly disguised himself supported the prosecutor's
theory.  In any event, there was no objection to the
remark which would have permitted a curative
instruction and no perception of prejudice.  We,
therefore, find no basis, either as a result of a
single comment or in the aggregate, on which to
reverse.  See State v. Koedatich, 112 N.J. 225, 323
(1988), cert. denied, 488 U.S. 1017, 109 S.Ct. 813, 102
L.Ed.2d 803 (1989); State v. Ramseur, 106 N.J. 123,
322-23 (1987); State v. Farrell, 61 N.J. 99, 102, 107
(1972).

(Opinion of the Appellate Division, April 13, 1999, at 9-15.)[2]

---

    [2] Although the Appellate Division did not specifically
address the claim of prosecutorial misconduct arising out of the
cross-examination of witnesses to try to elicit testimony casting
doubt on a defense witness's testimony that he did not know other
defense witnesses, that issue was exhausted on direct appeal of
the conviction.  (Brief and Appendix of Defendant-Appellant
before the Appellate Division, Point VIII; Letter Petition for
Certification, Point VIII.)

The U.S. Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. ...  Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).  "The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone.  Prosecutors sometime breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence."  United States v. Young, 470 U.S. 1, 7 (1985).

Under U.S. Supreme Court precedent, where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).  In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by or responsive to prior comments by opposing counsel.  Darden, 477 U.S. at 181-82.  Thus, "Supreme Court precedent

16

counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

Here, there is no evidence that the prosecutor knew before the start of trial that the witness to whom he referred in his opening, Adam Fennell, would not be called to testify because information became available suggesting that his testimony would be untrue.  Evidence was elicited from other witnesses that Petitioner and Nickerson were both drug dealers, injecting the motive of drug rivalry into the case through other means. Defense counsel was free to point out that the prosecution did not proffer the witness described in the opening, and the court gave appropriate instructions.  In his summation, the prosecutor did make an inadvertent reference to hearsay testimony, to which the trial court sustained an objection and provided an immediate curative instruction.

> Sustained.  There is absolutely no evidence in this
> case what Mr. Baldwin would have said to this witness
> in this case.  If Mr. Baldwin was called as witness in
> this case I will tell you right now he would not have
> identified Mr. Daniels as the shooter in this case.
> That is a given.  You can take that as a fact in this
> case.  Stay away from that area.

(5T160.)  The trial court gave a second curative instruction at the end of the prosecutor's summation.  (5T178-79.)  While the

17

allusion to the mafia in the prosecution's closing was intemperate, it did not deprive Petitioner of a fair trial.  Nor did the cross-examination, which was cut short, seeking to cast doubt on the truthfulness of a defense witness on the subject of his knowledge of other defense witnesses and observers, deprive Petitioner of a fair trial.

The decision of the Appellate Division was neither contrary to nor an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief on this claim.

B.   <u>Confrontation Clause</u>

Petitioner contends that he was deprived of his Sixth Amendment right to confront witnesses against him by the testimony of police officers Rashid Sabur and Lonnie Hilton, who testified that they went to Petitioner's apartment looking for him on the basis of information received, and by the testimony of Nikita Pickett, whose testimony allegedly implied the existence of non-testifying witnesses who could identify Petitioner as the perpetrator.  (Petition, Grounds Two, Three, Six.)

Officer Sabur testified that he went to Petitioner's apartment because "We had developed information that an individual we may have been interested in as being responsible for certain activities that occurred at the scene."  Following objection, the court gave a limiting instruction, and the prosecutor rephrased the question, "On information received, did

18

you have occasion to go to the area of 222 Seymour Avenue?" to which the officer responded, "Yes, I did.  To locate an individual based on the information that may have --."  The court stopped the answer and gave a second limiting instruction, then pointed out to defense counsel that Petitioner was released after questioning, thus minimizing any alleged prejudice from any alleged hearsay evidence.  (3T31-38.)  Officer Hilton similarly testified that he went to Petitioner's apartment because "We had received information that ... to locate an individual who was possibly responsible for the shooting."  Again, the court followed the objection to this testimony with a curative instruction.  (5T10-17.)

In her testimony, Ms. Pickett stated that she saw Petitioner approach the fast-food store and, after the shooting, observed him leaving the store.  She also testified that she had observed Taka Baldwin at the scene.  She then explained that she decided to contact the police a couple of days after the murder because "nobody wanted to do anything want, nobody wanted to tell the police what they knew or anything." (4T81-83.)  Petitioner characterizes this testimony as suggesting that Mr. Baldwin could have identified him as the shooter.  As noted above, the trial court gave a strong curative instruction that Mr. Baldwin would not have testified that Petitioner was the shooter.

19

The Appellate Division rejected the Confrontation Clause claim.

> We are satisfied that neither Detective Sabur nor Investigator Hinton testified as to any specific information they received so as to constitute inadmissible hearsay warranting a mistrial and that, in any event, the trial judge's rulings and curative instructions cured any problem.  State v. Irving, 114 N.J. 427, 445-46 (1989); State v. Bankston, 63 N.J. 263, 268 (1973).  See also State v. Winter, 96 N.J. 640, 647 (1984).  In this connection, we note, as did the trial judge in denying a mistrial, the evidence is clear that defendant was released after Sabur and Hinton took him to police headquarters and questioned him.  Thus the jury knew that they had not received information warranting his arrest when they started to look for defendant and before Ms. Collins gave her second statement.

> Similarly, the judge's instructions to the jury cured any problem with respect to the remote possibility that Nikita Pickett's testimony was understood to contain inadmissible hearsay.

(Opinion of the Appellate Division, April 13, 1999, at 7-8.)

The Sixth Amendment's Confrontation Clause provides that, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  Recently, the Supreme Court has traced the historical roots of the Confrontation Clause and has distinguished the application of the Confrontation Clause to different types of hearsay evidence.  See generally Crawford v. Washington, 541 U.S. 36 (2004).

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law -- as does [Ohio v. ]Roberts, [448 U.S. 56, 66 (1980),] and as would an approach that exempted such statements from Confrontation Clause scrutiny

20

altogether.  Where testimonial evidence is at issue,
however, the Sixth Amendment demands what the common
law required:  unavailability and a prior opportunity
for cross-examination.  We leave for another day any
effort to spell out a comprehensive definition of
"testimonial."  Whatever else the term covers, it
applies at a minimum to prior testimony at a
preliminary hearing, before a grand jury, or at a
former trial; and to police interrogations.  These are
the modern practices with closest kinship to the abuses
at which the Confrontation Clause was directed.

Crawford, 541 U.S. at 68 (footnote omitted).[3]  See also Davis v.

Washington, 126 S.Ct. 2266 (2006) (statements taken by police in

the course of an interrogation are "nontestimonial," and are not

subject to the Confrontation Clause, when they are made under

circumstances objectively indicating that the primary purpose of

the interrogation is to enable police assistance to meet an

ongoing emergency; statements taken by police in the course of

interrogation are "testimonial," and subject to the Confrontation

Clause, when the circumstances objectively indicate that there is

no ongoing emergency and that the primary purpose of the

interrogation is to establish or prove past events potentially

relevant to later criminal prosecution).  The Confrontation

Clause "does not bar the use of testimonial statements for

---

[3] In Ohio v. Roberts, 448 U.S. 56, 66 (1980), the Supreme
Court held that the Confrontation Clause does not preclude the
admission of an unavailable witness's hearsay statement if it
bears "adequate indicia of reliability."  Under Roberts, a
hearsay statement contains such "adequate indicia of reliability"
if it falls within a "firmly rooted hearsay exception" or if it
bears "particularized guarantees of trustworthiness."  448 U.S.
at 66.

purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n.9 (citing Tennessee v. Street, 471 U.S. 409 (1985)).

The Court of Appeals for the Third Circuit has not addressed the issue whether Crawford applies retroactively.  Most Circuit Courts, however, have held that it does not, on the rationale that newly promulgated rules of criminal procedure generally do not apply retroactively to cases on collateral review.  See generally Espy v. Massac, 443 F.3d 1362 (11th Cir. 2006) (Crawford rule does not apply retroactively); Dorchy v. Jones, 398 F.3d 783, 788 (6th Cir. 2005) (same); Murillo v. Frank, 402 F.3d 786, 790 (7th Cir. 2005) (same); Mungo v. Duncan, 393 F.3d 327, 336 (2d Cir. 2004) (same), cert. denied, 544 U.S. 1002 (2005); Brown v. Uphoff, 381 F.3d 1219, 1227 (10th Cir. 2004) (same), cert. denied, 543 U.S. 1079 (2005).  Contra Bockting v. Bayer, 399 F.3d 1010 (9th Cir. 2005).

In any event, Confrontation Clause errors are subject to harmless error analysis.  See U.S. v. Reynolds, 171 Fed.Appx. 961, 966, 2006 WL 760291, *4 (3d Cir. 2006) (citing Delaware v. VanArsdall, 475 U.S. 673, 684; United States v. Al-Sadawi, 432 F.3d 419, 426 (2d Cir. 2005)).  See also U.S. v. Arriola-Perez, 137 Fed.Appx. 119, 133, 2005 WL 1463502, *11 (10th Cir. 2005).

Prior to the Crawford opinion, the Court of Appeals for the Third Circuit had held that, under certain circumstances, police

officers may reveal information received out-of-court for the
limited purpose of establishing background or context for the
officers' actions.  See United States v. Sallins, 993 F.2d 344
(3d Cir. 1993).  At the same time, the Court noted the potential
for abuse.

> "In criminal cases, an arresting or investigating
> officer should not be put in the false position of
> seeming just to have happened upon the scene; he should
> be allowed some explanation of his presence and
> conduct.  His testimony that he acted 'upon information
> received,' or words to that effect, should be
> sufficient.  However, cases abound in which the officer
> is allowed to relate historical aspects of the case,
> replete with hearsay statements in the form of
> complaints and reports, on the ground that he was
> entitled to give the information upon which he acted.
> The need for the evidence is slight, the likelihood of
> misuse great."

Sallins, 993 F.2d at 346 (quoting 2 McCormick on Evidence § 249,
at 104 (4th ed. 1992)).  See also United States v. Lopez, 340
F.3d 169 (3d Cir. 2003) (again recommending the use of "general
terms" to provide background for police activities); United
States v. Price, 2006 WL 2337255 (3d Cir. June 30, 2006) ("Police
officers are permitted under Sallins to explain the background
context for their arrival at a scene.  When the explanation
cannot be effected without relating some contents of the
information received, Sallins does not prohibit admission of such
details.").

Here, it appears that any information tying Petitioner to
the shooting would have come into the possession of the police as

23

a result of investigation.  Thus, any such statements must be considered "testimonial."  Even if <u>Crawford</u> were to apply retroactively, however, Petitioner is not entitled to relief. The testimony by police did not go beyond a background explanation for the reason they went to Petitioner's apartment, that they had information suggesting they might locate a suspect there.  The officers' testimony did not reveal any incriminating statements.  There was no violation of the Confrontation Clause. To the extent the testimony did violate the Confrontation Clause, any error was harmless beyond a reasonable doubt, especially in light of the curative instructions.

Similarly, any suggestion in Nikita Pickett's testimony that other witnesses could identify Petitioner as the shooter, which would be non-testimonial hearsay under <u>Crawford</u>, was rendered harmless by the trial court's emphatic curative instruction.

The Appellate Division decision was neither contrary to nor an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on this claim.

C.   <u>Evidentiary Rulings</u>

Petitioner argues that he was deprived of due process as a result of the admission of Wanda Collins's testimony tying him to other criminal conduct - "assaulting people, threatening them, things of that nature" - and the trial court's inadequate

curative instruction.  (Petition, Grounds Four, Five.)  The Appellate Division rejected this claim.

> During the testimony of Wanda Collins, in response to the prosecutor's question as to why she had not told what she knew to police in her initial statement, she answered:
>
>> Because I didn't want to be involved in it. I didn't, you know, I had - I have children, I have a mother, I have grandmothers, aunts, uncles, sisters and brothers.  Basically I have children, you know.  I know how they are.  I was worrying about myself at the time.
>
>> Even assuming that the jury considered this statement as reflecting fear of defendant because of "other bad acts," as opposed to concern about being a witness in a murder case, the judge's multiple and forceful instructions cured any problem.  The judge instructed the jurors not to consider Collins' testimony as suggesting that defendant threatened her or a member of her family, that the testimony could not be used "as indicating in any way ... that Mr. Daniels is guilty of anything," that "[t]here is absolutely no evidence or proof" that Collins or any family members "was ever threatened" and to "strike from consideration ... that comment in any manner or for any purpose in arriving at your verdict."  See State v. Winter, supra. In fact, a second curative instruction was given to prevent an inference of wrongdoing which defendant suggested might flow from the giving of the first.

(Opinion of the Appellate Division, April 13, 1999, at 8-9.)

It is well-established that the violation of a right created by state law is not cognizable as a basis for federal habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting Lewis v. Jeffers, 497 U.S. 764, 680 (1990))).  Accordingly, Petitioner cannot obtain relief

for any errors in state law evidentiary rulings, unless they rise to the level of a deprivation of due process.  <u>Estelle</u>, 502 U.S. at 70 ("'the Due Process Clause guarantees fundamental elements of fairness in a criminal trial'") (quoting <u>Spencer v. Texas</u>, 385 U.S. 554, 563-64 (1967)).

For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial.  <u>Keller v. Larkins</u>, 251 F.3d 408, 413 (3d Cir.), <u>cert. denied</u>, 534 U.S. 973 (2001).

Here, state law permits evidence of other bad acts under certain circumstances.  <u>See</u> N.J.R.E. 404(b).  Petitioner has pointed this Court to no Supreme Court precedent in support of his position, and this Court has located none.  To the contrary, in <u>Estelle</u>, the Supreme Court upheld the admission of evidence of prior injuries, that were probative on the question of intent in a trial for infant murder, and refused habeas relief for a deficient limiting instruction.

"Admission of 'other crimes' evidence provides a ground for federal habeas relief only if 'the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial.'" <u>Bronshtein v. Horn</u>, 404 F.3d 700, 730-31 (3d Cir. 2005) (quoting <u>Lesko v. Owens</u>, 881 F.2d 44, 52 (3d Cir. 1989)).

26

> When evidence of a defendant's other crimes is
> introduced ..., there is sometimes "a substantial
> danger of unfair prejudice" because the jury may
> consider the evidence as proof of bad character or
> propensity to commit the crime charged.  United States
> v. Murray, 103 F.3d 310, 316 (3d Cir.1997), cert.
> denied, 525 U.S. 911, 119 S.Ct. 254, 142 L.Ed.2d 209
> (1998).  To alleviate this risk, counsel may request a
> cautionary instruction.  See generally Lesko v. Owens,
> 881 F.2d 44, 55 (3d Cir.1989), cert. denied,493 U.S.
> 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990).  In some
> circumstances, such an instruction may be strongly
> advisable; in others, counsel may reasonably conclude
> that it is strategically preferable to omit such a
> request since the instruction might have the undesired
> effect of highlighting the other crimes evidence.

Buehl v. Vaughn, 166 F.3d 163, 170 (3d Cir. 1999).

In a case analyzing whether admission of evidence of threats

unrelated to the defendant so violated Federal Rules of Evidence

401 and 403 as to require a new trial, the Court of Appeals for

the Third Circuit found that any prejudice that resulted from the

testimony was eliminated by the trial court's immediate curative

instruction.  See United States v. Vaulin, 132 F.3d 898 (3d Cir.

1997).  By contrast, where evidence of a threat to a witness can

be linked to a defendant, and therefore tends to establish

consciousness of guilt, "'the probativeness of the death threat

[outweighs] any danger of undue prejudice.'" Id. at 900 (quoting

U.S. v. Gonzalez, 703 F.2d 1222, 1223 (8th Cir. 1983)).

Here, to the extent Ms. Collins's testimony could be

construed as suggesting threatening behavior by Petitioner, the

trial court gave an appropriate cautionary instruction.  The

decision of the Appellate Division that Petitioner was not

deprived of a fair trial was neither contrary to nor an
unreasonable application of clearly established federal law.
Petitioner is not entitled to relief on this claim.

D.   Ineffective Assistance of Counsel

Petitioner contends that he was deprived of the effective
assistance of trial counsel because counsel failed to interview
and compel favorable testimony of a prosecution witness to
discredit the State's "good faith" belief in pursuing an
unsupported motive theory, counsel failed to object to the
instruction on identification, and counsel failed to object to
the instruction which relieved the State of its burden of proof.
More specifically, Petitioner contends that his trial counsel
should have called Perry Barnhill, who allegedly could have
testified that Adam Fennell was not credible and had admitted to
him that he (Fennell) would say anything to obtain his freedom.
Petitioner contends that, although the court provided the model
jury instruction on identification, trial counsel should have
requested an instruction highlighting the fact of inconsistencies
in Ms. Collins's prior description of the shooter.  Finally,
Petitioner contends that trial counsel should have objected to an
instruction that the State had proved Petitioner acted either
purposely or knowingly.  (5T193.)

Petitioner contends that he was deprived of the effective
assistance of appellate counsel by the failure of appellate

counsel to raise these issues of ineffective assistance of trial counsel.  Petitioner contends that PCR counsel failed to independently review the record, meet with Petitioner, or prepare a brief.  (Petition, Grounds Eleven, Twelve, Thirteen.)

The PCR court denied relief on the claims of ineffective assistance of trial and appellate counsel.  The PCR court found the claims procedurally barred under N.J.Ct.R. 3:22-4, in that the claims "could have and should have been raised in his initial appeal," or under N.J.Ct.R. 3:22-5, in that they had been considered and denied on direct appeal.  In addition, the PCR court found the claims meritless.

> Notwithstanding the dismissal of petitioner's motion for procedural deficiencies petitioner's motion must also fail for lack of a meritorious claim. Petitioner's argument regarding ineffective assistance of trial and appellate counsel is without merit.  This court's jury instruction on identification and the various crimes charged in the indictment were entirely proper and consistent with due process.

> Petitioner has not shown how trial or appellate counsel's conduct prejudiced him within the meaning of the effective assistance of counsel standard.  The claimed errors do not overcome the presumption that counsel's conduct was within the wide range of acceptable, reasonable, professional assistance, nor do they demonstrate prejudice to defendant sufficient to undermine confidence in the outcome of the trial. Moreover, and of equal importance, thorough study of the record shows that defendant was provided a rigorous, viable defense and appeal and that his counsels' performance were not unreasonable or inadequate.  Defense and appellate counsel were conscientious and zealous in their presentation of the petitioner.  The record does not support or even give rise to a fair inference that trial or appellate

29

counsel's performance was in any way inadequate or
below a level of reasonable competence.

Finally, even assuming that counsels' performance
could in some way be characterized as deficient which I
do not find, their conduct was not so deficient as to
create a reasonable probability that these deficiencies
materially contributed to defendant's conviction.
State v. Fritz, 105 N.J. 1987); see also Strickland v.
Washington, 466 U.S. 668.

In short, petitioner has failed to meet the heavy
burden of proof that, but for his counsels' performance
the result would have been any different.

The defendant has failed to set forth a prima
facie case, and is not entitled to a full evidentiary
hearing.  The record is entirely barren of any proof of
petitioner's allegation.

(Letter Opinion of Superior Court of New Jersey, Law Division,

Essex County, dated October 5, 2001, at 2-3.)  The Appellate

Division summarily affirmed the PCR court's rejection of

Petitioner's various claims of ineffective assistance of counsel,

noting only that Petitioner had failed to present a prima facie

case of ineffective assistance and therefore had no right to an

evidentiary hearing.  (Opinion of Appellate Division, dated Nov.

3, 2004.)

    1.  Trial Counsel

    The Counsel Clause of the Sixth Amendment provides that a

criminal defendant "shall enjoy the right ... to have the

Assistance of Counsel for his defence."  U.S. Const. amend. VI.

The right to counsel is "the right to effective assistance of

counsel." <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970)
(emphasis added).

To prevail on a claim of ineffective assistance of counsel,
a habeas petitioner must show both that his counsel's performance
fell below an objective standard of reasonable professional
assistance and that there is a reasonable probability that, but
for counsel's unprofessional errors, the outcome would have been
different. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694
(1984). A "reasonable probability" is "a probability sufficient
to undermine confidence in the outcome." <u>Strickland</u> at 694.
Counsel's errors must have been "so serious as to deprive the
defendant of a fair trial, a trial whose result is reliable."
<u>Id.</u> at 687. "When a defendant challenges a conviction, the
question is whether there is a reasonable probability that,
absent the errors, the factfinder would have had a reasonable
doubt respecting guilt." <u>Id.</u> at 695.

The performance and prejudice prongs of <u>Strickland</u> may be
addressed in either order, and "[i]f it is easier to dispose of
an ineffectiveness claim on the ground of lack of sufficient
prejudice ... that course should be followed." <u>Id.</u> at 697.

There is "a strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance."
<u>Strickland</u>, 466 U.S. at 689. As a general matter, strategic
choices made by counsel after a thorough investigation of the

31

facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91.  If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of Strickland.  See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

The State's witness on motive, Adam Fennell, did not testify because it came to the prosecution's attention during trial that his testimony was unreliable.  Accordingly, it is hard to imagine how Petitioner was prejudice by the failure to call a witness to discredit Mr. Fennell.  Moreover, at the PCR hearing, Petitioner's counsel conceded that Perry Barnhill would not provide a statement in support of the PCR petition.  (PCR Transcript at 22-24.)  Thus, Petitioner failed to provide any evidence in support of his contention that Mr. Barnhill would have provided favorable testimony at trial.

Petitioner's claims that trial counsel was ineffective for failing to object to the jury instructions on identification, credibility, and the burden of proof are equally unavailing.

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal

habeas petitioner challenges jury instructions given in a state

criminal proceeding,

> [t]he only question for us is "whether the ailing
> instruction by itself so infected the entire trial that
> the resulting conviction violates due process."  It is
> well established that the instruction "may not be
> judged in artificial isolation," but must be considered
> in the context of the instructions as a whole and the
> trial record.  In addition, in reviewing an ambiguous
> instruction ..., we inquire "whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way" that violates the
> Constitution.  And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly."  "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations

omitted).  Thus, the Due Process Clause is violated only where

"the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state

law." Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re

Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause

protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the

crime with which he is charged"); Sandstrom v. Montana, 442 U.S.

510, 523 (1979) (jury instructions that suggest a jury may

convict without proving each element of a crime beyond a

reasonable doubt violate the constitutional rights of the

accused).

33

Where such a constitutional error has occurred, it generally is subject to "harmless error" analysis. <u>Smith v. Horn</u>, 120 F.3d at 416-17; <u>Neder v. United States</u>, 527 U.S. 1, 8-11 (1999). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." <u>Id.</u> at 418 (citing <u>California v. Roy</u>, 519 U.S. 2, 5 (1996)).  In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.  If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

<u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).

However, a jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden [of proof beyond a reasonable doubt] is plainly inconsistent with the constitutionally rooted presumption of innocence." <u>Cool v. United States</u>, 409 U.S. 100, 104 (1972). "[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." <u>Victor v. Nebraska</u>, 511 U.S. 1, 22 (1994); <u>see also</u> <u>Cage v. Louisiana</u>, 498 U.S. 39, 41 (1990).  As the Supreme Court explained in <u>Victor</u>,

34

> so long as the court instructs the jury on the
> necessity that the defendant's guilt be proved beyond a
> reasonable doubt, the Constitution does not require
> that any particular form of words be used in advising
> the jury of the government's burden of proof.  Rather,
> taken as a whole, the instructions [must] correctly
> conve[y] the concept of reasonable doubt to the jury.

Victor, 511 U.S. at 6 (citations and internal quotation marks omitted).

"[A] misdescription of the burden of proof ... vitiates all the jury's findings.  Sullivan v. Louisiana, 508 U.S. 275, 281 (1993) (emphasis in original).  Such an error is considered structural and thus is not subject to harmless error review.  See id. at 280-82.  But see Neder v. United States, 527 U.S. 1, 8-11 (1999) (applying harmless-error analysis where jury was not instructed on an element of an offense).

Before the Appellate Division, Petitioner's PCR counsel admitted that the jury charges on identification and credibility were not erroneous, but argued that trial counsel could have requested jury instructions that included more commentary on the inconsistencies in Ms. Collins's testimony.  (Brief and Appendix on Behalf of Defendant-Appellant on Appeal from an Order Denying Post-Conviction Relief at 28-32.)  As there was no error in the trial court's instructions on identification and credibility, it cannot be said that the instructions probably contributed to an incorrect result.  Moreover, in his summation, defense counsel highlighted the inconsistencies in Ms. Collins's statements and

35

various challenges to her credibility.  (5T126-137.)  There was no ineffective assistance of counsel with respect to the jury instructions on identification and credibility.

The claim that counsel should have objected to an instruction that altered the burden of proof also is meritless. The claim rests on one sentence in a 38-page jury charge. Throughout the jury charge, the trial court repeatedly instructed the jury that Petitioner was entitled to the presumption of innocence and that the State bears the burden of proof beyond a reasonable doubt.  (5T184-186, 188, 189-90, 191-95, 198-200, 201-04, 206-08.)  At one point, however, in discussing the issue of "motive," the trial court instructed:

> Mr. Daniels's position is I am not the person who shot Mr. Nickerson and you know what the State's position is in this case.  Although, the State has proof that the defendant acted either purposely or knowingly the State is not required to prove a motive.
>
> If the State has proved the essential elements of the offense beyond a reasonable doubt Mr. Daniels must be found guilty of the offense regardless of motive for a lack of a motive.  If the State, however, has proved a motive you may consider that motive in as far as it gives meaning to the other circumstances in the case. On the other hand, you may consider the absence of a motive in weighing whether Mr. Daniels is guilty of the crimes charged in this case.

(5T193-94.)  Although the trial court may have misspoken in stating that "the State has proof that the defendant acted either purposely or knowingly," the jury charge, taken as a whole, does not relieve the State of its burden of proof.  In the very next

36

sentence, for example, the trial court restated what it intended to say in the challenged sentence, that "If the State has proved the essential elements of the offense beyond a reasonable doubt," the State is not required to prove motive.  (Emphasis added.)  Taken as a whole, the jury charge is not erroneous, and trial counsel did not provide ineffective assistance by failing to object to this isolated sentence.

The decision of the Appellate Division was neither contrary to nor an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief on this claim.

  2. Appellate Counsel

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right.  Evitts v. Lucey, 469 U.S. 387 (1985).  The Strickland standard for effective assistance of counsel applies to appellate counsel.  See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004).  Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Here, as trial counsel was not ineffective, appellate counsel did not provide ineffective assistance by failing to assert on appeal a claim that trial counsel was ineffective. Petitioner is not entitled to relief on this claim.

    3.   PCR Counsel

Pursuant to 28 U.S.C. § 2254(i), "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." Accordingly, Petitioner is not entitled to relief on this ground.

E.   Sufficiency of the Evidence/Cumulative Error

Petitioner contends that the jury's verdict was against the weight of the evidence and that the aggregate effect of the trial errors deprived him of a fair trial. (Petition, Grounds Nine, Ten.) Specifically, Petitioner contends that the evidence is insufficient because "the State presented no physical evidence connecting defendant to the crime. No murder weapon was found, nor was any physical evidence obtained from the defendant or from his residence demonstrating an actual involvement in the incident." (Petition, Ground Nine.)

The Appellate Division rejected the claim that aggregate error warranted reversal.

    Moreover, we find no cumulative error warranting
    reversal. State v. Orrechio, 16 N.J. 125, 129 (1954).
    In that connection, we note, in addition to the
    testimony of Collins and Pickett, the jury heard police

38

testimony that defendant at first claimed to be someone else and then denied being inside the restaurant at the time of the shooting.  There was therefore more than sufficient evidence before the jury on which to convict.

(Opinion of the Appellate Division, April 13, 1999, at 15-16.)

A claim that the jury's verdict was against the weight of the evidence raises a due process concern.  Only where, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" should the writ issue.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  This standard must be applied "with explicit reference to the elements of the criminal offense as defined by state law."  Jackson, 443 U.S. at 324, n.16.  See also Orban v. Vaughn, 123 F.3d 727 (3d Cir. 1997), cert. denied, 522 U.S. 1059 (1998).  As noted above, state court factual determinations are presumed to be correct.  See Werts v. Vaughn, 228 F.3d 178, 186 (3d Cir. 2000).

Here, Petitioner does not allege that there is not evidence to establish all or any of the elements of the crime, but bases his claim on the lack of physical evidence.  Petitioner has directed this Court to no Supreme Court precedent prohibiting conviction on the basis of eyewitness testimony and circumstantial evidence, in the absence of physical evidence, and this Court has located none.

39

Even if none of Petitioner's claims on its own amounts to a constitutional violation, the "cumulative effect of the alleged errors may violate due process." United States ex rel. Sullivan v. Cuyler, 631 F.2d 14, 17 (3d Cir. 1980); see also Pursell v. Horn, 187 F.Supp.2d 260, 374 (W.D. Pa. 2002) ("That the reliability of a state criminal trial can be substantially undermined by a series of events, none of which individually amounts to a constitutional violation, is an idea that has been accepted by nearly every federal court to have addressed the issue."). Neither the Supreme Court nor the Court of Appeals for the Third Circuit has established a standard by which a claim of cumulative error must be determined. See Pursell, 187 F.Supp.2d at 374-76 (describing three alternative approaches).

The decision of the Appellate Division is not contrary to, and does not involve an unreasonable application of, clearly established federal law nor is it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional

right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Here, Petitioner has not made a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

V.  <u>CONCLUSION</u>

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.

/s/ Joel A. Pisano
Joel A. Pisano
United States District Judge

Dated:  August 22, 2006